UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

MICHAEL MORGAN, et al., )
 )
    Plaintiffs, )
 )
vs. ) Case No. 1:12-CV-136 (CEJ)
 )
ORTHOPAEDIC ASSOCIATES OF )
SOUTHEAST MISSOURI, P.C., et al., )
 )
    Defendants. )

# MEMORANDUM OPINION

Plaintiff Michael Morgan suffered a deep surgical wound infection following spinal fusion surgery performed at St. Francis Medical Center in Cape Girardeau, Missouri in March 2009. He brings a claim of medical negligence against defendant Bernard Burns, D.O., the former director of the Rehabilitation Unit at St. Francis, and Dr. Burns' employer, Orthopaedic Associates of Southeast Missouri, P.C.[1] Plaintiff claims that Dr. Burns was negligent in failing to timely diagnose and respond to his post-operative infection.[2] As a result of the infection, plaintiff developed several life-threatening medical conditions, including sepsis, osteomyelitis, deep venous thrombosis, and a pulmonary embolus. Plaintiff seeks damages of approximately $1.9 million.

The parties appeared for a bench trial on January 21-23, 2014. After considering the testimony and other evidence presented, the Court makes the following

---

[1] Plaintiff originally filed suit against his surgeon, Dr. Sonjay Fonn, and Dr. Fonn's employer, Midwest Neurosurgeons, LLC., in addition to Dr. Burns and Orthopaedic Associates. See Morgan v. Midwest Neurosurgeons, LLC., 1:11-CV-37 (CEJ). Dr. Burns and Orthopaedic Associates were dismissed without prejudice from that case, and Dr. Fonn and Midwest Neurosurgeons ultimately settled for an undisclosed amount.

[2] Michael Morgan's wife, Laurie Morgan, was also named as a plaintiff in this case and brought a claim for loss of consortium. Mrs. Morgan passed away prior to the trial, and the parties agree that her cause of action has abated.

findings of fact and conclusions of law as required by Rule 52(a)(1) of the Federal Rules of Civil Procedure.

I.   **Findings of Fact**

   A.   **Background**

Plaintiff is 61 years old, resides in Elkville, Illinois, and is a citizen of the State of Illinois. He worked as a cable drawer for General Cable in Southern Illinois for ten years, until he awoke on the morning of November 4, 2008 with severe back pain. Plaintiff sought treatment from a local chiropractor, who referred him to Sonjay Fonn, D.O., an osteopathic neurosurgeon practicing in Cape Girardeau, Missouri. Over the next few months, Dr. Fonn administered a series of steroid injections, but plaintiff's pain persisted. Dr. Fonn then recommended spinal fusion surgery and plaintiff consented to the procedure. On March 6, 2009, Dr. Fonn performed a four-level fusion on plaintiff's low back at the L2-3, L3-4, L4-5, and L5-S1 levels, at St. Francis Medical Center in Cape Girardeau.

Initially, plaintiff's post-operative course appeared unremarkable. On March 11, plaintiff was discharged from the Surgical Unit and admitted to the Inpatient Rehabilitation Unit at St. Francis, where Dr. Burns was the Medical Director. Dr. Burns is an osteopathic physiatrist, and is board certified in physical medicine and rehabilitation. He is a resident and citizen of the State of Missouri, where he is licensed to practice medicine. At all relevant times, Dr. Burns was employed by defendant Orthopaedic Associates of Southeast Missouri, P.C., a Missouri corporation with its principal place of business in Cape Girardeau, Missouri. During plaintiff's stay in the Rehabilitation Unit, Dr. Fonn remained plaintiff's attending physician, and Dr. Burns acted as a consulting physician. See, e.g., Def. Ex. C at 661; 673.

Dr. Burns first saw plaintiff on March 12. He conducted a physical examination, but did not personally examine the surgical incision. He developed a rehabilitation plan that included physical and occupational therapy, coping with limitations, wound care, and social work case management. Def. Ex. C. at 660-62. On March 13, both Dr. Fonn and Dr. Burns examined plaintiff's incision. Dr. Fonn noted that the incision was intact with no dressing. Id. at 665. Dr. Burns also observed that the incision was clean, dry, and intact. Id. at 666.

By March 16, the incision had changed. The nurses of Dr. Fonn and Dr. Burns observed and recorded these changes. At 8:30 a.m. on March 16, Dr. Burns' nurse, Shelley Miller, R.N., examined the wound and recalls observing drainage and separation of the edges of the incision. Miller Dep. at 32. She wrote in plaintiff's chart: "dressing noted to have drainage and was actively draining small amount when incision assessed," and "middle area noted to have small separation with small amount of drainage." Pl. Ex. 13.

Shortly thereafter, at 9:00 a.m., Dr. Fonn's nurse practitioner, Karen Karalunas, APRN, examined plaintiff. Nurse Karalunas wrote that plaintiff was "healing nicely" and observed "scant drainage with darkened slough tissue present in the upper half of the incision." Pl. Ex. 15. Nurse Karalunas was concerned about the appearance of the incision, so she showed it to Dr. Fonn. Karalunas Dep. at 33-34. At 2:26 p.m., Nurse Miller again noted that the wound was draining. She recorded that the incision was "red along incision line & staples, small amount [of] yellow drainage, no tenderness noted…. Dr. Fonn's nurse aware of this issue." Pl. Ex. 16. She added a "risk of infection" section to the care plan documents due to the changes she observed in the incision. Miller Dep. at 35-36.

On March 17 at 8:00 a.m., Dr. Burns and his nurse practitioner, Waltina (Tina) Kisner, examined plaintiff's incision. Nurse Kisner documented "yellowish drainage - necrotic areas noted 2-3 areas on incision line." Pl. Ex. 18. A sample of the drainage was obtained for a wound culture, a Gram stain, a CBC (complete blood count), and a "Chem 7" blood test. Nurse Kisner informed Dr. Burns that she had ordered these tests, and he concurred. Kisner Dep. at 39; Pl. Ex. 17. Dr. Burns testified that, although he did not believe plaintiff had an infection, he authorized the tests to be done out of an abundance of caution. Dr. Burns testified that he never personally observed drainage or dehiscence (separation) of the wound, but he did see that the incision was moist and red, which he attributed to superficial irritation from plaintiff's back brace. Nurse Kisner informed Nurse Karalunas, that a wound culture was being performed. Kisner Dep. at 54; Karalunas Dep. at 41.

At 8:20 a.m., plaintiff's rehabilitation team convened for their weekly group meeting. In attendance were all of plaintiff's care providers in the Rehabilitation Unit, including Dr. Burns, physical and occupational therapists, social workers, and nurses, as well as plaintiff and his wife, Laurie Morgan. Pl. Ex. 19. The report from that meeting suggests that plaintiff would be discharged from the hospital in the next two to three days. Pl. Ex. 20. Dr. Burns testified at trial that plaintiff expressed a desire to go home, and although some team members felt that plaintiff could benefit from one or two additional days in the hospital to improve his mobility, no one believed that plaintiff was suffering from a surgical site infection.

At 9:50 a.m., Dr. Fonn telephoned an order for plaintiff's discharge, on which Dr. Burns signed off. Pl. Ex. 17. Dr. Burns testified that he had the final say in discharging plaintiff. As part of the discharge plan, home health care nurses were

scheduled to visit plaintiff over the next few days to check his wound dressing and to monitor his vital signs. Plaintiff was also scheduled to see Dr. Fonn the following week for staple removal. Id.

At about 12:30 p.m. on March 17, plaintiff left the hospital. After plaintiff's departure, tests results began to come back from the laboratory. The Gram stain taken of the sample of drainage collected that morning showed no white blood cells or microorganisms, which are typical signs of infection.[3] Pl. Ex. 30. The CBC showed a normal white blood cell count, Def. Ex. AA., and the Chem 7 showed electrolyte levels within the normal range. Def. Ex. B at 9. Because the wound culture is a lengthier process, the results of that test were not received before plaintiff's discharge.

In the evening of March 17, plaintiff developed a fever. Mrs. Morgan called the hospital and was told to administer Tylenol and return to the hospital if plaintiff's temperature exceeded 103 degrees. L. Morgan 11/1/2011 Dep. at 101. The following morning, on March 18 at 9:05 a.m., the preliminary culture results came back from the laboratory and were available for electronic review by authorized medical care personnel, including Dr. Burns. Dep. Matthews at 36. The results showed light growth of a Gram-positive *Enteroccocus* species and light to moderate growth of Gram-negative rod. Pl. Ex. 30. These results were faxed to Dr. Burns and Dr. Fonn on the morning of the 19th. Matthews Dep. at 35-36. However, Dr. Burns did not review them.

On March 18 at 1:15 p.m., VNA Home Health Nurse Cheryl Tubbs arrived at the Morgan home and observed that plaintiff had a fever and "red hot yellow slough around

---

[3] A Gram stain involves placing a sample of the drainage on a microscope slide, which is then processed with stains and viewed under the microscope. The test yields rapid results, but even a negative Gram stain does not rule out the possibility of infection.

[the] top of [the] incision." Tubbs Dep. at 36. Nurse Tubbs called Dr. Fonn's office to report her findings, and Dr. Fonn called in a prescription for Keflex, an antibiotic. Id. at 33. Keflex is not effective against either species of bacteria that the preliminary culture results revealed and with which plaintiff was infected.

On March 20, another VNA nurse, Stephanie Lovan, visited the Morgan home, and found that plaintiff's temperature was elevated, and his pulse and respiration were abnormal. Nurse Lovan observed that plaintiff became clammy and sweated profusely when attempting to rise from bed. Lovan Dep. at 20. She suggested plaintiff return to the hospital immediately. Id. at 21-22.

Plaintiff was readmitted to the hospital at 2:30 p.m. on March 20. Def. Ex. C at 1353. He was diagnosed with hypotension, sepsis, acute renal failure, and a lumbar wound infection. Pl. Ex. 27; Pl. Ex. 35. An abscess—a collection of necrotic tissue, white blood cells, and bacteria—had formed by plaintiff's spine, requiring surgery. On March 21, Dr. Fonn opened the wound for drainage and debridement. Pl. Ex. 35. Cultures taken grew *Klebsiella pneumoniae* and *Enterococcus* species, the same species visible on the original culture ordered by Dr. Burns. After this surgery, plaintiff remained in the Surgical Unit at St. Francis for several weeks. On April 13, plaintiff experienced a sudden increase in back pain as he was being transferred by nurses. A CT scan of plaintiff's lower back on April 14 revealed a fracture at L2, which had not been observed in previous scans. Pl. Ex. 36.

On April 15, plaintiff was transferred to Barnes-Jewish Hospital in St. Louis at the request of his wife, where he was admitted to the neurosurgery floor and treated for his post-operative wound infection, intraspinal abscess, deep venous thrombosis, and a pulmonary embolus. Pl. Ex. 37. Plaintiff was discharged on April 25, and

admitted to the Rehabilitation Institute of St. Louis, where he remained until May 13, 2009. Pl. Ex. 38.

Plaintiff testified that, because he was heavily medicated during his hospital stays at St. Francis, he has little recollection of his time there. He takes at least seven different medications on a daily basis, including morphine to manage the pain in his lower back. Plaintiff uses a 4-legged cane to move around at home, and a wheelchair and scooter for traveling long distances. He is able to drive a car, but with significant discomfort. Plaintiff has not worked since his back pain began on November 4, 2008. He suffers from depression, and can no longer pursue his hobbies of hunting, fishing, or socializing with friends.

B.  **Medical Expert Testimony**

1.  **Plaintiff's Medical Experts**

Plaintiff retained three experts to testify regarding standard of care and causation. The Court heard live testimony from Charles W. Stratton, IV, M.D., and David G. Kennedy, M.D., and considered the report and deposition of Patricia A. Hurford, M.D.

Dr. Stratton is the Director of the Clinical Microbiology Laboratory at Vanderbilt University Hospital and an Associate Professor of pathology at Vanderbilt University School of Medicine, where he teaches infectious diseases and clinical microbiology. He is board certified in medical microbiology. Although he formerly saw patients on a regular basis, he now sees patients only occasionally at the request of colleagues, and has not actively cared for patients since 1998.

Dr. Stratton testified that the appearance of plaintiff's wound on March 16 and 17 clearly indicated the presence of infection. Whether that infection was superficial or

deep could have been determined only by an MRI scan to determine whether an abscess had formed, surgically opening the wound, or culturing the wound and then closely monitoring plaintiff's temperature and pain level. Dr. Stratton explained that plaintiff should not have been discharged from the hospital on March 17. Rather, Dr. Burns should have begun empiric intravenous antibiotics in response to the dehiscence and drainage from the wound, to safeguard against the "worst-case scenario" of a deep wound infection. Failure to do so was, in Dr. Stratton's opinion, a deviation from the standard of care. He opined that broad spectrum antibiotics would have killed the bacteria in the bloodstream, preventing sepsis and forestalling all the complications that followed. However, antibiotics would not have treated the abscess, which had to be surgically drained.

Dr. Stratton also opined that Dr. Burns breached the standard of care when he failed to review the preliminary wound culture results when they became available for viewing on March 18 and when they were faxed to Dr. Burns on March 19. He explained that a communication from Dr. Burns to Dr. Fonn about the pendency of the culture results would have constituted a proper "hand-off," sufficient to shift the responsibility for viewing and responding to the results from Dr. Burns to Dr. Fonn. Had a proper hand-off occurred, Dr. Stratton testified that Burns would be "free and clear." However, Dr. Stratton stated that a hand-off requires direct physician-to-physician communication, and no such communication occurred in this case.

Dr. Kennedy is an orthopedic neurosurgeon practicing in St. Louis, Missouri. He testified that Dr. Burns breached the standard of care when he discharged plaintiff from the hospital on March 17, when the wound showed visible signs of infection. He explained that the necrotic areas along the incision, in conjunction with drainage, were

"red flags" that needed to be monitored. Dr. Kennedy testified that Dr. Burns breached the standard of care again when he failed to check the preliminary culture results. According to Dr. Kennedy, the results were definitive evidence that plaintiff was infected with two very aggressive types of organisms. Plaintiff should have started antibiotics specifically tailored to target those organisms. Dr. Kennedy opined that, had plaintiff been started on antibiotics and had his abscess been drained on the day the culture results were obtained, he probably would not have developed sepsis or any of its life-threatening consequences. Dr. Kennedy conceded that four-level spinal fusion surgeries are infrequently performed, and place stress on the unfused joints. He agreed that plaintiff's ability to engage in physical activity would be limited after such a surgery, even had he not developed a deep wound infection.

Dr. Hurford is board certified in Physical Medicine and Rehabilitation. She currently cares for spinal disorders in an outpatient setting at the Orthopedic Sports Medicine and Spine Care Institute in Kirkwood, Missouri. In her expert report and deposition, she explained that the physician ordering tests from the laboratory is responsible for reviewing the results and following up on the results if necessary. She opined that the spread of plaintiff's infection would have been prevented had proper follow-up occurred in this case. Pl. Ex. 55; Hurford Dep. at 37-38.

2. **Defendant's Medical Experts**

Defendant also retained three medical expert witnesses. The Court heard live testimony from Alan Alfano, M.D., and Kristine Johnson, M.D. The Court also considered the deposition testimony of John Luce, M.D.

Dr. Alfano is the Chief of the Inpatient Division of the Department of Physical Medicine and Rehabilitation and the Medical Director of HealthSouth Rehabilitation

Hospital at the University of Virginia (UVA). He is also an Associate Professor at UVA. Def. Ex. J. Dr. Alfano is board certified in physical medicine and rehabilitation, and has 17 years of experience with rehabilitation of back surgery patients. He testified that he sees three to five spine surgery patients per week, and because UVA has a world-renowned spinal surgery practice, he has seen many patients who have undergone multi-level, extensive spinal fusion procedures.

According to Dr. Alfano, Dr. Burns' discharge of plaintiff from the hospital on March 17 comported with the standard of care. Dr. Alfano noted that nurses were scheduled to visit plaintiff at home to monitor his condition, and that the only possible indication of infection prior to discharge was the appearance of the wound. Dr. Alfano explained that all other indicators of infection—functional decline of the patient, changes in vital signs, elevated white blood counts, and increased pain levels—were absent. He disagreed with Dr. Stratton's suggestion that intravenous antibiotics and an MRI should have been ordered immediately, based on the appearance of the wound alone.

Dr. Alfano also expressed his opinion that Dr. Burns did not breach the standard of care by failing to check the culture results on March 18 and 19. He explained that culture results from a sample taken from the surface of the skin are not useful in determining the presence of a deep wound infection, and skin cultures are prone to cross-contamination. He stated that he would not have ordered a superficial wound culture in this case. Dr. Alfano also testified that, in his opinion, there was a clear hand-off of responsibility for the culture results to Dr. Fonn. He explained that a hand-off does not require direct communication from doctor to doctor. In fact, he expressed his preference for communicating with nurse practitioners rather than communicating

directly with physicians. He has found this to be a more effective mode of communication.

Finally, Dr. Alfano stated that the preliminary culture results might have been used to guide initial antibiotic therapy once plaintiff developed more convincing signs and symptoms of an infection. After surgery, cultures would reveal the type of bacteria growing at the surgical site, and that information would determine the ultimate course of antibiotics.

Dr. Johnson is an Assistant Professor in the Division of Infectious Diseases at the Johns Hopkins University School of Medicine. Def. Ex. L. She specializes in wound infections, and spends the majority of her time in clinic interacting with patients.

Dr. Johnson testified that the appearance of the wound, as described in the medical records leading up to plaintiff's discharge from the hospital, did not indicate infection. She explained that redness can be a sign of inflammation, and not infection, and that, in the absence of telltale signs of infection such as changes in heart rate, blood pressure, and white blood cell count, separation and drainage from the wound are "not alarming." She testified that starting plaintiff on empiric antibiotics based on the appearance of the wound would have been be ill-advised, considering the dangerous side-effects of such treatment.

She further testified that plaintiff's discharge on March 17 was appropriate, despite the pending lab values. Like Dr. Alfano, she expressed the opinion that the failure to check the preliminary culture results was not a breach of the standard of care, as that culture was taken from a non-sterile site and was not clinically useful or in any way indicative of what, if anything, was brewing in the deep tissues. She also testified that a hand-off may occur between teams rather than between doctors, and

a hand-off occurred in this case. Finally, Dr. Johnson explained that an infection from back surgery in which hardware is implanted into the body is difficult to treat, and even had Dr. Burns acted differently, plaintiff's infection would have required a second operation to drain the abscess.

Dr. Luce is Emeritus Professor of Clinical Medicine and Anesthesia at University of California at San Francisco and a critical care physician. Def. Ex. P. Dr. Luce testified that he believed that "aftercare" was arranged (*i.e.*, a hand-off) by virtue of Nurse Kisner informing Nurse Karalunas that a culture was being done. According to Dr. Luce, Dr. Burns "felt that the aftercare would be given by Dr. Fonn, which is exactly what the plan always was." Luce Dep. at 20. Dr. Luce also testified that, even had Dr. Burns vetoed plaintiff's discharge from the hospital or learned the results of the culture, plaintiff would not have fared any better. Dr. Luce based this opinion on the fact that Dr. Fonn was the physician responsible for plaintiff, and Dr. Fonn testified in his deposition that he would not have acted differently had he known the preliminary results of the culture. Id. at 22-23.

II. **Conclusions of Law**

The Court has jurisdiction under 28 U.S.C. 1332(a), as the parties are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. The substantive law of Missouri applies in this diversity case. See Sosna v. Binnington, 321 F.3d 742, 743 (8th Cir. 2003) (citing Erie Railroad Co. v. Tompkins, 304 U.S. 64, 78 (1938)). To establish a claim of negligence under Missouri law, plaintiff must prove: "(1) the existence of a duty on the part of the defendant to protect the plaintiff from injury, (2) a failure of the defendant to perform that duty, and (3) an injury proximately caused by the defendant's failure." Blevens

v. Holocomb, 469 F.3d 692, 694 (8th Cir. 2006) (citation omitted).  In a medical malpractice suit, plaintiff "must prove that, by act or omission, the defendant failed to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of his profession and that this negligent act or omission in fact caused the plaintiff's injury." Sosna, 321 F.3d at 744 (citing Washington by Washington v. Barnes Hosp., 897 S.W.2d 611, 615 (Mo. 1995)).  Plaintiff must prove these elements by a preponderance of the evidence.  See, e.g., Hart v. United States, No. 4:09-CV-1946 (CAS), 2012 WL 4111906, at *6 (E.D. Mo. Sept. 19, 2012).

In most instances, "a plaintiff cannot state a prima facie case of medical negligence without expert testimony describing how the defendant's conduct fell below the applicable standard of care." Blevens, 469 F.3d at 694 (citing Hart v. Steele, 416 S.W.2d 927, 931-32 (Mo. 1967)).  This is because the specific duty required of the defendant is defined by the profession, and an "expert witness is generally necessary to tell [the fact finder] what the defendant should or should not have done under the particular circumstances of the case and whether the doing of that act or the failure to do that act violated the standards of care of the profession." Ostrander v. O'Banion, 152 S.W.3d 333, 338 (Mo. Ct. App. 2005).  Once the duty is established by expert testimony, whether a physician was negligent under the evidence presented becomes a question of fact for the fact finder. Lashmet v. McQueary, 954 S.W.2d 546, 551 (Mo. Ct. App. 1997).

In this case, the actual progression of plaintiff's infection is undisputed.  Plaintiff suffered from a deep post-operative wound infection.  The medical expert witnesses all agreed that the infection was most likely introduced on March 6, 2009 during plaintiff's spinal fusion surgery.  The experts also agreed that four-level spinal fusion

surgeries are relatively rare, and carry a heightened risk of infection due to the length of the procedure and the introduction of metal into the surgical site. Furthermore, the medical records show, and the experts were unanimous in concluding, that plaintiff's vital signs, CBC, and Gram stain provided no indication of infection while plaintiff was in the Rehabilitation Unit.

Plaintiff's infection formed an intraspinal abscess, requiring surgery. The infection moved to his blood and his bones. He developed severe sepsis, resulting in renal failure, and presented on March 20, 2009 as hypotensive and in septic shock. Osteomyelitis weakened his bones and resulted in the fracture of his L2 vertebra. The collapse of that vertebra contributed to plaintiff's kyphosis, the abnormal bend of his spine, which causes pain and limits his mobility. Finally, prolonged hospitalization and extended bed-rest caused plaintiff to develop deep vein thrombosis (DVT) and a pulmonary embolus. Plaintiff must take anti-coagulants for the pulmonary embolus and DVT and antibiotics to suppress osteomyelitis every day for the rest of his life. There is no doubt that plaintiff has suffered greatly, and plaintiff was a credible and sympathetic witness at trial.

In dispute is whether Dr. Burns breached the standard of care, and, if so, whether that breach caused any or all of plaintiff's damages. Plaintiff's witnesses testified that Dr. Burns' conduct fell below the standard of care when he failed to diagnose plaintiff's infection and keep plaintiff in the hospital for observation and empiric antibiotic therapy on March 17, and again when he failed to obtain the culture results on March 18 and 19. Dr. Burns maintains that his conduct aligned with the standard of care in every respect. He suggests that the clinical evidence available on March 17 did not suggest that plaintiff had a deep wound infection or needed to stay

in the hospital any longer, especially when nurses would be visiting him at home to monitor his progress and vital signs. He argues that his failure to look at the results of the culture he ordered, and to act on those results, did not breach the standard of care, because the results were clinically useless and his team handed off responsibility for those results to Dr. Fonn. The testimony of Dr. Burns' experts supports his position. Ultimately, this case turns on conflicting expert opinions regarding the standard of care.

### A. Discharge from the Hospital on March 17

Dr. Alfano and Dr. Johnson testified that Dr. Burns did not breach the standard of care when he discharged plaintiff from the hospital on March 17. They explained that the only possible sign of infection on the 17th was the appearance of the wound, as described by the nurses in plaintiff's medical chart. Plaintiff's vital signs were normal. His CBC was normal. He was not experiencing an increase in pain. He felt well enough to want to go home. In short, plaintiff had no other symptoms a physician would expect to see in a patient with a surgical site infection. Dr. Alfano is the chief of an inpatient rehabilitation hospital where many patients are recovering from spinal fusion surgeries, and Dr. Johnson is an infectious disease specialist, with a focus on wound infections, who spends most of her time with patients. Doctors Alfano and Johnson routinely observe and treat wounds in an inpatient setting, and the Court finds their testimony on this issue credible and persuasive.

Plaintiff began to exhibit symptoms of infection after his discharge. As Dr. Johnson testified, surgical site infections take time to declare themselves. It is now known that plaintiff was suffering from such an infection. However, without the benefit of hindsight, Dr. Burns used that degree of skill and learning ordinarily used under the

same or similar circumstances by members of his profession in concluding that plaintiff could be safely discharged home, with certain precautions in place. Those precautions included the vigilance of home health care nurses and the pending culture results. Those precautions would ensure that, in the event that plaintiff had an infection, symptoms of it would be observed, plaintiff would return to the hospital, and Dr. Fonn would have a culture result—albeit taken from a superficial site—to guide his selection of antibiotics until a more accurate diagnosis could be obtained.

Without any other signs of an infection, the appearance of the wound was simply not enough to alert Dr. Burns to the presence of something as serious as a deep wound infection. Moreover, Dr. Alfano and Dr. Johnson testified that it would be ill-advised to start an aggressive therapy like empiric intravenous antibiotics solely based on the wound's appearance. They explained that such therapy can have devastating side-effects, and should not be used lightly when there is no serious concern of infection. They also testified, convincingly, that ordering an MRI based on the wound's appearance would be extreme and unconventional, and they would not have done so in this situation. Taking into account the experience of Dr. Alfano and Dr. Johnson, the Court finds their testimony on this issue more credible than that proffered by Dr. Stratton, who has not actively cared for patients since 1998, or by Dr. Kennedy.

The Court does not question that Dr. Stratton and Dr. Kennedy are both very knowledgeable and experienced physicians. Their experience is relevant to the case at hand—Dr. Stratton specializes in microbiology and infectious diseases, and Dr. Kennedy is an neurosurgeon who performs spinal fusion procedures—and their testimony was intelligent and informative. However, the Court believes that the experience of Dr. Alfano and Dr. Johnson tips the scale of credibility in defendants'

favor. Moreover, plaintiff carries the burden of proof. Plaintiff has not shown by a preponderance of the evidence that Dr. Burns breached the standard of care when he failed to keep plaintiff in the hospital, start plaintiff on antibiotics, or order an MRI.

### B. Follow-Up on Preliminary Culture Results

At trial, there were conflicting expert opinions as to whether a hand-off occurred between Dr. Burns and Dr. Fonn sufficient to shift the responsibility for checking and following up on the culture. As plaintiff's expert Dr. Stratton conceded, if a hand-off occurred, Dr. Burns is "free and clear" and cannot be found to have breached the standard of care for failing to check the results.

Dr. Stratton and Dr. Kennedy insisted that no hand-off occurred in this case, because a hand-off requires doctor-to-doctor communication. Dr. Stratton cited to the rules established by the Joint Commission, the organization that accredits hospitals, as defining "effective communication" between physicians as doctor-to-doctor communication. Dr. Burns admits that he did not personally inform Dr. Fonn of the pending culture results, and no notation documenting the exchange of information between those doctor's nurses appears in the medical records.

Dr. Alfano, Dr. Johnson, and Dr. Luce, on the other hand, disagreed with Dr. Stratton and Dr. Kennedy's narrow definition, and testified that a broader range of communications is used to hand-off responsibility from one physician to the next. Defendants' experts explained that, as long as information on pending lab results have been communicated from the ordering physician's team to the team of the physician now responsible for checking those results, a hand-off has occurred. That communication can be between any member of the team, including residents, nurses, or physicians. After the communication is made, it is reasonable to rely on one's

-17-

colleagues and expect that follow-up will occur. Although Dr. Alfano and Dr. Johnson agreed that the hand-off in this case does not appear in the medical records, they concluded from the depositions of the nursing staff that a hand-off did occur.

Dr. Burns' nurse practitioner Kisner testified in her deposition that, when she ordered the culture, she informed Dr. Fonn's nurse practitioner Karalunas that "it had been ordered and that they needed to watch for it." Kisner Dep. at 54. Nurse Kisner testified that the primary physician - Dr. Fonn - should have been responsible for the culture results. Id. Nurse Karalunas testified that Nurse Kisner called her, and said that she was culturing the wound. Karalunas Dep. at 41. She stated that Dr. Fonn was aware of the culture. Id. at 47-48.

While that phone conversation is not documented in the medical records, the records do show a clear shift of responsibility between teams. The home health nurses were to contact Dr. Fonn, not Dr. Burns, if any issues arose. When plaintiff developed a fever, Nurse Tubbs called Dr. Fonn, who called in a prescription for plaintiff. Plaintiff was scheduled to return to see Dr. Fonn the following week. Dr. Burns testified that the care of plaintiff had been transferred completely back to Dr. Fonn at the time of plaintiff's discharge, and that Dr. Fonn knew about the pending culture results.

The Court is persuaded by defendants' expert testimony that a hand-off may occur without direct physician-to-physician communication. The Court is particularly swayed by Dr. Alfano's testimony on this issue, as he actively cares for patients and is, like Dr. Burns, the chief of the inpatient rehabilitation division of a hospital, where interfacing with surgeons and other physicians is frequent. After considering the expert testimony, the deposition testimony of the nurses and doctors involved in plaintiff's care at St. Francis, and the medical records, the Court concludes that a hand-

off did occur in this case. A member of Dr. Burns' team informed a member of Dr. Fonn's team that the culture had been ordered, and to look out for the results. Dr. Burns' expectation that Dr. Fonn would follow-up on those results was reasonable, and accordingly Dr. Burns did not deviate from the standard of care by not checking the results himself.

### C. Causation and Damages

There were also conflicting expert opinions as to whether the conditions resulting from plaintiff's infection could have been prevented, or mitigated, had Dr. Burns acted differently. Because the Court finds that Dr. Burns did not breach the standard of care, the Court need not reach the issues of causation or damages or discuss the testimony of the experts on damages.

### III. Conclusion

Based on the foregoing, the Court finds that plaintiff has not established by a preponderance of the evidence that Dr. Burns breached the standard of care by failing to diagnose his infection, sending him home from the hospital without antibiotics, and failing to check the results of the culture. Therefore, the defendants are entitled to judgment on plaintiff's claims of medical negligence.

A judgment consistent with this Memorandum Opinion will be entered separately.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 17th day of June, 2014.